# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Kathryn L. Loomis

PEOPLE v PAGANO

Docket No. 159981. Argued November 10, 2020 (Calendar No. 4). Decided April 22, 2021.

Victoria C. Pagano was charged in the 73B District Court with operating a motor vehicle while intoxicated with a child as a passenger, MCL 257.625(7)(a)(*i*), and having an open container in a vehicle, MCL 257.624a. An anonymous caller phoned 911, alleging that defendant was driving while intoxicated. Central dispatch informed a police officer of the call, and within 30 minutes, the officer observed defendant's vehicle but did not see defendant commit any traffic violations. Although it appeared that a copy of the 911 call might have been preserved, a recording was not introduced into evidence, and the caller was not identified. According to the officer's testimony, the anonymous caller informed dispatch that defendant was out of the vehicle, yelling at children, and appeared to be obnoxious. The anonymous caller believed that defendant's alleged intoxication was the cause of her behavior with the children. The caller further provided the vehicle's license plate number; the direction in which the vehicle was traveling; and the vehicle's make, model, and color. The officer pulled defendant over strictly on the basis of the information relayed in the 911 call. Defendant was arrested and subsequently charged. Defendant moved for dismissal of the charges, arguing that the investigatory stop was unlawful and that, as a result, any evidence obtained pursuant to the stop should be suppressed. The district court, David B. Herrington, J., held a hearing on defendant's motion and granted the motion, holding that there was no probable cause to stop defendant's vehicle because the 911 call was not reliable. The district court dismissed the case without prejudice. The prosecution moved for reconsideration, and the district court denied the motion. The prosecution appealed in the Huron Circuit Court, and the circuit court, Gerald M. Prill, J., held a hearing, noting that defendant's motion to dismiss was better understood as a motion to suppress evidence and recognizing that the applicable legal standard was not whether there was probable cause to stop the vehicle; however, the circuit court affirmed the district court's ruling. The prosecution sought leave to appeal in the Court of Appeals, and the Court of Appeals granted the application. In an unpublished per curiam opinion issued on May 28, 2019 (Docket No. 340859), the Court of Appeals, MURRAY, C.J., and GADOLA and TUKEL, JJ., reversed and remanded for reinstatement of the charges, concluding that the officer had a reasonable and articulable suspicion of criminal activity sufficient to justify an investigative stop of defendant's vehicle. Defendant sought leave to appeal in the Supreme Court, and the Supreme Court granted the application. 505 Mich 938 (2019).

In an opinion by Justice B<small>ERNSTEIN</small>, joined by Chief Justice M<small>C</small>C<small>ORMACK</small> and Justices V<small>IVIANO</small>, C<small>LEMENT</small>, and C<small>AVANAGH</small>, the Supreme Court *held*:

Under the totality of the circumstances, the stop of defendant's vehicle did not comply with the Fourth Amendment because the police officer did not have a reasonable and articulable suspicion that defendant was engaged in criminal activity.

1. Both the United States Constitution and the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures. Even a brief traffic stop constitutes a seizure of a vehicle's occupants. However, under *Terry v Ohio*, 392 US 1 (1968), a police officer may, in appropriate circumstances and in an appropriate manner, approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. A brief, on-the-scene detention of an individual is not a violation of the Fourth Amendment as long as the officer can articulate a reasonable suspicion for the detention. Colloquially, a brief detention of this sort is referred to as a *Terry* stop. Whether an officer has a reasonable and articulable suspicion to briefly detain an individual is a fact-specific inquiry that is determined on a case-by-case basis, using commonsense judgments and inferences about human behavior. Although reasonable and articulable suspicion is a lesser showing than probable cause, it still entails something more than an inchoate or unparticularized suspicion or hunch, because an officer must have had a particularized and objective basis for the suspicion of criminal activity.

2. The anonymous tip from the 911 caller did not give rise to a reasonable and articulable suspicion that defendant was engaged in a traffic violation, much less criminal activity. An anonymous tip, when sufficiently corroborated, can exhibit sufficient indicia of reliability to justify a *Terry* stop. However, that a tipster has reliably identified a particular individual does not necessarily mean that information contained in a tip gives rise to anything more than an inchoate or unparticularized suspicion of criminal activity. Assuming that the tipster here was reliable would lead only to the conclusion that defendant appeared to be "obnoxious" and was yelling at her children in a parking lot, as there were no other details in the record that would corroborate the tipster's mere assertion that defendant was drunk. While the Supreme Court of the United States did hold in *Navarette v California*, 572 US 393 (2014), that certain driving behaviors are so strongly correlated with drunk driving that, when reported to the police by anonymous callers, the totality of the circumstances may give rise to a reasonable and articulable suspicion of criminal activity, the Court cautioned that not all traffic violations imply intoxication and that some behaviors are so tenuously connected to drunk driving that a stop on those grounds alone would be constitutionally suspect. In this case, there was no report of even a minor traffic infraction, and there was no support for the conclusion that "appearing to be obnoxious" and yelling at children creates a reasonable and articulable suspicion that one is intoxicated. The tipster's information was little more than a conclusory allegation of drunk driving, which was insufficient to pass constitutional muster.

Reversed and remanded to the Huron Circuit Court for further proceedings.

Justice V<small>IVIANO</small>, joined by Chief Justice M<small>C</small>C<small>ORMACK</small>, concurring, agreed with the majority's application of *Navarette* to defendant's Fourth Amendment claim and believed that the majority reached the correct result. He wrote separately to explain his misgivings about *Navarette* and to suggest that the Court consider, in an appropriate future case, whether to interpret Const

1963, art 1, § 11 as providing more protection regarding anonymous tips than the Fourth Amendment as interpreted by *Navarette*, given Michigan's historical requirement that an anonymous tip be reliable both in its assertion of illegality and in its tendency to identify a particular person.

Justice ZAHRA, concurring, agreed with the result reached by the majority, and he concluded that the 911 caller's conclusory allegation that defendant drove while intoxicated, absent further record evidence leading to an inference of an actual traffic violation, was insufficient to provide the arresting officer with the requisite reasonable suspicion to justify the traffic stop under *Navarette*. He wrote separately to emphasize that his conclusion was driven largely by the limited factual record and that nothing in the majority opinion should be read to discourage citizen reports or police investigations of drunk or impaired driving.

Justice WELCH did not participate in the disposition of this case because the Court considered it before she assumed office.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED April 22, 2021

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                      No. 159981

VICTORIA CATHERINE PAGANO,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH (except WELCH, J.)

BERNSTEIN, J.

This case presents a question concerning the Fourth Amendment and investigatory stops pursuant to *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). After an anonymous caller alleged that defendant was driving while intoxicated, a police officer located and stopped defendant's vehicle. We hold that, under the totality of the circumstances, the stop did not comply with the Fourth Amendment because the police officer did not have a reasonable and articulable suspicion that defendant was engaged in

criminal activity.  Accordingly, we reverse the judgment of the Court of Appeals and remand to the circuit court for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

On July 31, 2016, a Huron County police officer was informed by central dispatch of a 911 call that had been made.  Although it appears that a copy of the 911 call might have been preserved, a recording was not introduced into evidence.  The caller was not identified.  The officer would later testify as follows:

> Um the information that our dispatch had given us is that she was out of the vehicle at that location at the time.  The caller was concerned because she had ah children with her and she was yelling; appearing to be obnoxious; and appeared to be intoxicated um that was causing her behavior ah with the children.  And then had left is why the caller thought she was intoxicated.

The caller also relayed the vehicle's license plate number and the direction in which it was traveling, as well as the vehicle's make, model, and color.

Within 30 minutes of the 911 call, the officer observed defendant's vehicle, which matched the caller's description.  The officer followed the vehicle for a short time to corroborate the identifying information.  During this period, the officer did not see defendant commit any traffic violations.  When the officer subsequently pulled defendant over, the officer was doing so "based strictly on the information" relayed in the 911 call. Defendant was then arrested for and subsequently charged with operating a motor vehicle while intoxicated with a child as a passenger, MCL 257.625(7)(a)(*i*), and open container in a vehicle, MCL 257.624a.

Defendant moved for dismissal of the charges, arguing that the investigatory stop was unlawful and that, as a result, any evidence obtained pursuant to the stop should be

2

suppressed. On March 21, 2017, a hearing was held in district court on defendant's motion. Although the officer was called as a witness, no other evidence was entered into the record. The district court granted defendant's motion, holding that there was no probable cause to stop defendant's vehicle because the 911 call was not reliable. Accordingly, the district court dismissed the case without prejudice. The prosecution moved for reconsideration, which was denied; the order denying the motion for reconsideration again referred to probable cause as the applicable standard for evaluating the lawfulness of the stop.

The prosecution appealed, and on September 27, 2017, a hearing was held in circuit court. The circuit court noted that defendant's motion to dismiss was better understood as a motion to suppress evidence and recognized that the applicable legal standard was not probable cause. Nevertheless, the circuit court affirmed the district court's ruling.

The prosecution sought leave to appeal in the Court of Appeals, and the Court of Appeals granted the application. On May 28, 2019, the Court of Appeals reversed and remanded for the reinstatement of charges. *People v Pagano*, unpublished per curiam opinion of the Court of Appeals, issued May 28, 2019 (Docket No. 340859). Specifically, the Court of Appeals concluded that the officer had reasonable and articulable suspicion of criminal activity sufficient to justify an investigative stop of defendant's vehicle.

Defendant timely sought leave to appeal in this Court. On December 23, 2019, this Court granted leave to appeal. *People v Pagano*, 505 Mich 938 (2019).

## II. STANDARD OF REVIEW

We review a lower court's factual findings in a suppression hearing for clear error. *People v Jenkins*, 472 Mich 26, 31; 691 NW2d 759 (2005). However, because the

3

application of constitutional standards presents a question of law, a lower court's ultimate ruling at a suppression hearing is reviewed de novo. *People v Custer*, 465 Mich 319, 326; 630 NW2d 870 (2001).

## III. ANALYSIS

Both the United States Constitution and the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11. Even a brief traffic stop constitutes a seizure of a vehicle's occupants. *Brendlin v California*, 551 US 249, 255; 127 S Ct 2400; 168 L Ed 2d 132 (2007). However, "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry*, 392 US at 22. "A brief, on-the-scene detention of an individual is not a violation of the Fourth Amendment as long as the officer can articulate a reasonable suspicion for the detention." *Custer*, 465 Mich at 327. Colloquially, a brief detention of this sort is referred to as a *Terry* stop. Whether an officer has reasonable and articulable suspicion to briefly detain an individual is a fact-specific inquiry that is determined on a case-by-case basis. *Jenkins*, 472 Mich at 32. "A determination regarding whether a reasonable suspicion exists must be based on commonsense judgments and inferences about human behavior." *Id*. (quotation marks and citation omitted). Although reasonable and articulable suspicion is a lesser showing than probable cause, it still "entails something more than an inchoate or unparticularized suspicion or 'hunch,' " because an officer "must have had a particularized and objective

4

basis for the suspicion of criminal activity." *People v Champion*, 452 Mich 92, 98-99; 549 NW2d 849 (1996).

The facts before us are undisputed. No information is known about the 911 caller, and the prosecution concedes that the caller should be treated as anonymous. The officer testified that defendant was detained solely on the basis of the information presented in that anonymous 911 call. Because the 911 call was not made part of the record, we only have the officer's summary of the information relayed to him by central dispatch.

The question before us, then, is whether this information presented the officer with the reasonable and articulable suspicion necessary to justify a *Terry* stop. An anonymous tip, when sufficiently corroborated, can exhibit sufficient indicia of reliability to justify a *Terry* stop. *Florida v J L*, 529 US 266, 270; 120 S Ct 1375; 146 L Ed 2d 254 (2000). The Court of Appeals analysis here focused almost exclusively on the reliability of the anonymous tip, concluding that "the informant's tip provided accurate details that were corroborated by the officer, making it sufficiently reliable, and also conveyed information related to contemporaneous and ongoing potential criminal activity." *Pagano*, unpub op at 4. However, the Court of Appeals failed to explain how the reliability of the anonymous tip alone rendered "the quantity of the tip information . . . sufficient to identify the vehicle and *to support an inference of a traffic violation . . . .*" *Id*. at 3 (emphasis added).

Under the circumstances presented here, we hold that the anonymous tip did not give rise to a reasonable and articulable suspicion that defendant was engaged in a traffic violation, much less criminal activity. It is true that the officer was able to corroborate information regarding the identification of the vehicle. However, that a tipster has reliably identified a particular individual does not necessarily mean that information contained in a

5

tip gives rise to anything more than an inchoate or unparticularized suspicion of criminal activity. See *J L*, 529 US at 272 ("The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."). Assuming that the tipster here was reliable leads only to the conclusion that defendant "appear[ed] to be obnoxious" and was yelling at her children in a parking lot, as there are no other details in the record that would otherwise corroborate the tipster's mere assertion that defendant was drunk. Certainly, commonsense judgments and inferences about human behavior lead one to conclude that many parents yell at their children, even without the aid of intoxicants.

The Supreme Court of the United States has held that certain driving behaviors are so strongly correlated with drunk driving that, when reported to the police by anonymous callers, the totality of the circumstances may give rise to a reasonable and articulable suspicion of criminal activity. *Navarette v California*, 572 US 393, 402; 134 S Ct 1683; 188 L Ed 2d 680 (2014) (noting that such behaviors include "weaving all over the roadway," "crossing over the center line" and "almost causing several head-on collisions," "driving all over the road and weaving back and forth," and "driving in the median") (quotation marks, citations, and brackets omitted). But the *Navarette* Court cautioned that not all traffic violations imply intoxication and that "[u]nconfirmed reports of driving without a seatbelt or slightly over the speed limit, for example, are so tenuously connected to drunk driving that a stop on those grounds alone would be constitutionally suspect." *Id*. at 402. Critical to the Supreme Court's decision in *Navarette* was the anonymous caller's claim that another vehicle had run her off the road. The *Navarette* Court distinguished this from other scenarios in which a tipster might suspect a driver is intoxicated, explaining that

6

"[t]he 911 caller in this case reported more than a minor traffic infraction and more than a conclusory allegation of drunk or reckless driving." *Id*. at 403. To the extent that even *Navarette* was considered to be a "close case," *id*. at 404 (quotation marks omitted), this case is clearly not. Again, there was no report of even a minor traffic infraction in this case, and there is no support for the conclusion that "appearing to be obnoxious" and yelling at one's children creates a reasonable and articulable suspicion that one is intoxicated. All we have here is little more than a conclusory allegation of drunk driving, which is insufficient to pass constitutional muster.

## IV. CONCLUSION

Because we conclude that the officer did not have the reasonable and articulable suspicion necessary to justify an investigatory stop, we hold that the stop violated the Fourth Amendment. Accordingly, we reverse the judgment of the Court of Appeals and remand to the circuit court for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.

Richard H. Bernstein
Bridget M. McCormack
David F. Viviano
Elizabeth T. Clement
Megan K. Cavanagh

7

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                          No. 159981

VICTORIA CATHERINE PAGANO,

       Defendant-Appellant.

_____

VIVIANO, J. (*concurring*).

I concur in full with the majority opinion and its application of *Navarette v California*, 572 US 393; 134 S Ct 1683; 188 L Ed 2d 680 (2014), to resolve defendant's Fourth Amendment claim. But I write separately to explain my misgivings about *Navarette* and why I believe this Court should consider, in an appropriate future case, whether to interpret our state Constitution as providing more protection regarding anonymous tips than the Fourth Amendment as interpreted by *Navarette*.[1]

In *Navarette*, the United States Supreme Court addressed when a police officer may perform a traffic stop based solely on an anonymous 911 call. The tipster in that case informed authorities of a possible drunk driver who had run the reporting party off the road. *Id*. at 395. The police officers spotted the vehicle and trailed it for about five minutes

_____

[1] Although defendant cited both the Fourth Amendment and Const 1963, art 1, § 11 in her briefs in the Court of Appeals and this Court, defendant focused her argument on the Fourth Amendment and did not argue that *Navarette* should be rejected under our state Constitution. In light of this, and because her claim can be fully resolved under the Fourth Amendment, I agree with the majority's decision to decide the case on that basis.

before pulling it over. *Id.* They smelled marijuana, approached the vehicle, and, upon searching the vehicle, found marijuana. *Id.* The driver and passenger were arrested and argued in court that the traffic stop violated the Fourth Amendment because the officers did not have reasonable suspicion of criminal activity. *Id.* at 395-396.

The Court determined that the anonymous call at issue had "adequate indicia of reliability for the officer to credit the caller's account." *Id.* at 398-399. The report of being run off the road by a specific vehicle showed that the caller was claiming eyewitness knowledge of alleged dangerous driving, which supported the report's reliability and also gave reasonable grounds to suspect drunk driving, given that the alleged conduct was more akin to classic indicia of drunk driving than a mere instance of recklessness. *Id.* at 399-401, 403. Furthermore, use of the 911 emergency system was an additional indicator of veracity because the calls are recorded and allow law enforcement to verify information about callers. *Id.* at 400-401.

Justice Scalia dissented, characterizing the majority's rule as allowing the police to stop a vehicle whenever a 911 call reports "a single instance of possibly careless or reckless driving" as long as the caller also gives the location of the vehicle. *Id.* at 405 (Scalia, J., dissenting). Justice Scalia noted that the tipster was a completely unknown person who could " 'lie with impunity.' " *Id.* at 406, quoting *Florida v J L*, 529 US 266, 275; 120 S Ct 1375; 146 L Ed 2d 254 (2000) (Kennedy, J., concurring). The accusation that the caller had been run off the road did not support an inference of drunk driving because the driver could have been swerving to avoid an animal, a pothole, or a pedestrian. *Navarette*, 572 US at 409-410 (Scalia, J., dissenting). Even if the driver had been careless, reckless, or intentional in forcing the tipster off the road, Justice Scalia did not believe that "reasonable

2

suspicion of a *discrete instance* of irregular or hazardous driving generates a reasonable suspicion of *ongoing intoxicated driving*." *Id*. at 410.  And the fact that the police had followed the driver for five minutes without observing any signs of drunkenness or incapacitation gave them good reason to doubt that the driver was drunk. *Id*. at 411.  Justice Scalia rejected the majority's speculation that a drunk driver who sees a marked police car would drive " 'more careful[ly],' " instead adhering to the "traditional view that the dangers of intoxicated driving are the intoxicant's impairing effects on the body—effects that no mere act of the will can resist." *Id*. at 413.  Regarding the majority's rule, Justice Scalia warned:

> All the malevolent 911 caller need do is assert a traffic violation, and the targeted car will be stopped, forcibly if necessary, by the police.  If the driver turns out not to be drunk (which will almost always be the case), the caller need fear no consequences, even if 911 knows his identity.  After all, he never alleged drunkenness, but merely called in a traffic violation—and on that point his word is as good as his victim's.  [*Id*. at 413-414.][2]

---

[2] Recent advances in technology appear only to reinforce Justice Scalia's concerns that *Navarette* further opened the 911 system to abuse by weakening the requirement that a tipster's assertion of illegality be reliable.  Those advances have made it even easier for bad actors to exploit the 911 system by "spoofing" a phone number so that the 911 dispatcher thinks the call is coming from a different phone number, providing even more cover for malevolent tipsters.  See Brumfield, *Chapter 284: Deterring and Paying for Prank 911 Calls That Generate a SWAT Team Response*, 45 McGeorge L Rev 585, 586 (2014) (explaining the process of spoofing a phone number); Kenyon, *FTC Issues Warning of Social Security Scams*, CQ Roll Call Washington Data Privacy Briefing (April 16, 2019) [2019 CQDPRPT 0288], available at <https:/perma.cc/WG42-A242> ("[T]he FTC recommends consumers to not trust caller ID systems because it is easy for official-seeming phone numbers to be spoofed . . . .").  In recent years, individuals have used spoofing technology to make fake 911 calls in order to prank or harass individuals.  See *Chapter 284*, 45 McGeorge L Rev at 585; Jaffe, *Swatting: The New Cyberbullying Frontier After Elonis v. United States*, 64 Drake L Rev 455, 456 (2016).  After *Navarette*, some commentators have cited spoofing as one reason why 911 calls may not be sufficiently reliable—specifically in the context of the *Navarette* decision.  See, e.g., Gelb, *How*

But alas, Justice Scalia's opinion did not carry the day, so we are bound to follow the majority opinion in *Navarette* for purposes of interpreting the Fourth Amendment. Doing so, I agree with the majority's application of *Navarette* to defendant's Fourth Amendment claim and believe that the majority reached the correct result. However, we are not required to follow *Navarette* for purposes of interpreting our state constitutional protection from unreasonable searches and seizures in Const 1963, art 1, § 11. For the reasons stated in this opinion, I question whether we should follow *Navarette* as a guide if we are asked in the future to interpret Article 1, § 11 of our state Constitution.

When construing a provision of the Michigan Constitution, our ultimate responsibility is to give meaning to the specific provision at issue. While looking at United States Supreme Court caselaw interpreting analogous federal constitutional provisions might be—and often is—helpful, we cannot delegate our duty to interpret our Constitution to the United States Supreme Court. See *People v Tanner*, 496 Mich 199, 222 n 16; 853 NW2d 653 (2014); see also *Sitz v Dep't of State Police*, 443 Mich 744, 758-759; 506 NW2d 209 (1993); Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* (New York: Oxford University Press, 2018), p 174 (criticizing the practice of "lockstepping," "the tendency of some state courts to diminish their constitutions by interpreting them in reflexive imitation of the federal courts' interpretation of the Federal Constitution," and providing "unreasonable searches and seizures" as an example). We "are not obligated to accept what we deem to be a major contraction of

*Reliable Is an Anonymous Call?*, 31 Crim Just 60, 61 (2016) ("At the federal level, *Navarette v. California* controls, but may arguably not provide the heightened safeguards against improper intrusion on one's right not to be stopped in a motor vehicle due to a fabricated anonymous call to law enforcement.").

4

citizen protections under our constitution simply because the United States Supreme Court has chosen to do so." *Sitz*, 443 Mich at 763.

But on a number of occasions we have stated that Const 1963, art 1, § 11 is to be construed as providing the same protections found in the Fourth Amendment unless there is a "compelling reason" to interpret it differently. See, e.g., *People v Collins*, 438 Mich 8, 25; 475 NW2d 684 (1991); *People v Perlos*, 436 Mich 305, 313 n 7; 462 NW2d 310 (1990). The idea that Const 1963, art 1, § 11 must be interpreted the same as the Fourth Amendment absent a compelling reason not to do so can be traced back to *People v Smith*, 420 Mich 1; 360 NW2d 841 (1984), in which we stated "that we will *only* accord defendants greater rights 'where there is compelling reason.' " *Smith*, 420 Mich at 20, quoting *People v Nash*, 418 Mich 196, 215; 341 NW2d 439 (1983) (emphasis added).[3]

We have articulated some helpful factors to consider in determining whether to apply federal precedent to analogous provisions of our state Constitution:

---

[3] I would also reconsider in a future case whether *Smith*'s compelling-reason presumption is correct. As we more recently stated in *Tanner*, 496 Mich at 222 n 16, "this Court need not apply that presumption, and it need not defer to an interpretation of the United States Supreme Court, unless we are persuaded that such an interpretation is also most faithful to the state constitutional provision." Additionally, to the extent that there might be a presumption against interpreting Const 1963, art 1, § 11 differently than the Fourth Amendment, it is just that—a presumption. As with any interpretive principle, a presumption is a "guide[] to solving the puzzle of textual meaning," Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 59, and the provision should ultimately be given a "fair reading," *id*. at 33. Additionally, some scholars have criticized this presumption in particular. See, e.g., Williams, *The Law of American State Constitutions* (New York: Oxford University Press, 2009), p 135 (characterizing the idea "that U.S. Supreme court [sic] interpretations of the federal Bill of Rights are presumptively correct for interpreting analogous state provisions" as "simply wrong" and a "mistaken premise"). Nevertheless, because *Navarette* fully resolves this case, there is no need to reconsider the presumption here.

"1) the textual language of the state constitution, 2) significant textual differences between parallel provisions of the two constitutions, 3) state constitutional and common-law history, 4) state law preexisting adoption of the relevant constitutional provision, 5) structural differences between the state and federal constitutions, and 6) matters of peculiar state or local interest." [*Tanner*, 496 Mich at 223 n 17, quoting *Collins*, 438 Mich at 31 n 39, in turn citing *People v Catania*, 427 Mich 447, 466 n 12; 398 NW2d 343 (1986).]

In terms of language and structure, Const 1963, art 1, § 11 does not meaningfully differ from the Fourth Amendment in a way that would support interpreting the provisions differently for purposes of this case. However, "it is not necessary that the wording of the Michigan Constitution be different from that of the United States Constitution in order for this Court to interpret our constitution more liberally than the United States Supreme Court interprets the language of the federal constitution." *Smith*, 420 Mich at 7 n 2.

Our search-and-seizure caselaw concerning anonymous tips, in which we have applied both the federal and state Constitutions, leads me to question whether we should adopt *Navarette* for purposes of interpreting our state constitutional protection against unreasonable searches and seizures. In particular, we have required greater corroboration of anonymous tips than is required by *Navarette*. Adopting *Navarette* would therefore represent a departure from our caselaw. Historically, in Michigan an anonymous tip alone was insufficient to give a police officer the requisite cause to make a warrantless search, seizure, or arrest. *People v Younger*, 327 Mich 410, 423-425; 42 NW2d 120 (1950) (explaining that "[a]nonymous information does not meet the test" for determining whether a warrantless search was reasonable under Const 1908, art 2, § 10); *People v Guertins*, 224 Mich 8, 9-10; 194 NW 561 (1923) ("[I]f the officer arrested the respondent solely upon the information which he received over the telephone, the arrest was not lawful, for the reason

that an officer has not the right to arrest a person, without a warrant and upon information which is given anonymously, without the discloser of the information and the source of his information. The officer cannot base a reasonable belief upon information which is secured in that way.").[4]

Our own development of the law regarding anonymous tips largely ceased after the United States Supreme Court held that the Fourth Amendment's prohibition of unreasonable searches and seizures applies to the states. See *Mapp v Ohio*, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961). Subsequently, Michigan courts applied the United States Supreme Court's *Aguilar-Spinelli* test for evaluating tips from informants. See *People v Sherbine*, 421 Mich 502, 505 n 3; 364 NW2d 658 (1974) (noting Michigan cases applying the *Aguilar-Spinelli* test), citing *Aguilar v Texas*, 378 US 108; 84 S Ct 1509; 12 L Ed 2d 723 (1964), abrogated by *Illinois v Gates*, 462 US 213 (1983), and *Spinelli v United States*, 393 US 410; 89 S Ct 584; 21 L Ed 2d 637 (1969), abrogated by *Illinois v Gates*, 462 US 213 (1983); *Sherbine* overruled by *People v Hawkins*, 468 Mich 488 (2003). During this period, we observed that "[f]rom both the Michigan and federal cases, it is clear

_____

[4] The relevant standard in *Younger* was probable cause, because it was decided prior to *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). Additionally, both *Younger* and *Guertins* discussed the search-and-seizure provision of our 1908 Constitution, which stated, in relevant part, "The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures." Const 1908, art 2, § 10. This sentence was changed slightly in the ratified version of our 1963 Constitution: "The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures." The changes were not substantive and were intended only to improve the phraseology. 2 Official Record, Constitutional Convention 1961, p 3364. Const 1963, art 1, § 11 has since been amended to also protect electronic data and electronic communications from unreasonable searches and seizures; however, that change was effective after the events giving rise to the present case. 2019 SJR G.

that while police officers may proceed upon the basis of information received from an informer and need not disclose the identity of the informer, in order to establish probable cause there must be a showing that the information was something more than a mere suspicion, a tip, or anonymous telephone call, and that it came from a source upon which the officers had a right to rely." *People v Walker*, 385 Mich 565, 575; 189 NW2d 234 (1971), overruled on other grounds by *People v Hall*, 435 Mich 599 (1990).

The United States Supreme Court later abandoned the "rigid" *Aguilar-Spinelli* test and adopted a "flexible" "totality-of-the-circumstances" test in *Illinois v Gates*, 462 US 213, 230-231, 238-239; 103 S Ct 2317; 76 L Ed 2d 527 (1983). Shortly after that decision, we raised the possibility—but did not resolve—whether our constitutional provision, Const 1963, art 1, § 11, would retain the *Aguilar-Spinelli* test rather than the new totality-of-the-circumstances test. *Sherbine*, 421 Mich at 506.

In *People v Faucett*, 442 Mich 153; 499 NW2d 764 (1993), however, we applied the totality-of-the-circumstances test from *Gates* and held that an anonymous tip can be sufficiently reliable to give rise to a reasonable suspicion of criminality if the tip is corroborated by independent police investigation. While we primarily focused on the Fourth Amendment, we briefly addressed Const 1963, art 1, § 11, opining that "[b]ecause the Michigan Constitution does not provide more protection than its federal counterpart, under the circumstances of this case, federal law controls our inquiry." *Faucett*, 422 Mich at 158.[5] We went on to discuss *Alabama v White*, 496 US 325; 110 S Ct 2412; 110 L Ed

---

[5] Although the Court did not provide a citation for this statement, it appears that we were relying on the questionable presumption that we derived from *Nash*. See note 3 of this opinion.

2d 301 (1990), which we characterized as "stand[ing] for the premise that anonymous tips, where corroborated by independent police investigation, may be sufficiently reliable to create a reasonable suspicion of criminality under the totality of the circumstances so that an investigative stop is warranted," *Faucett*, 442 Mich at 155 n 1, and applied it to the case. *Faucett*, 442 Mich at 166-172.[6] *Faucett* and *White* required independent corroboration by the police in order for a tip to be considered reliable, which is consistent with our earlier holdings in *Younger* and *Guertins* that information from an anonymous tip alone is insufficient to support a warrantless search, seizure, or arrest.

More recently, the Court of Appeals addressed a Fourth Amendment argument about an anonymous tip in *People v Horton*, 283 Mich App 105; 767 NW2d 672 (2009). In *Horton*, the Court of Appeals relied on *J L*, 529 US 266, for the proposition " 'that a tip [must] be reliable in its assertion of illegality, not just in its tendency to identify a determinate person' " in order to give rise to reasonable suspicion. *Horton*, 283 Mich App at 112, quoting *J L*, 529 US at 272.[7] Once again, this decision was consistent with *Younger* and *Guertins*.

_____

[6] In *White*, the police received an anonymous tip that the respondent would leave her apartment at a particular time in a brown Plymouth station wagon with a broken right taillight and that she would be going to a particular motel with an ounce of cocaine in a brown case. *White*, 496 US at 327. Officers confirmed the innocent details of the tip, followed the vehicle as it drove to the motel, and initiated a stop just short of the motel. *Id*. During a search of the vehicle, the officers found marijuana. *Id*. The United States Supreme Court determined that the tip was sufficiently reliable to justify the stop, explaining that police corroboration of "significant aspects" of the tipster's predictions "imparted some degree of reliability to the other allegations made by the caller." *Id*. at 331-332.

[7] In *J L*, an anonymous caller told the police that a young, black male in a plaid shirt was at a bus stop and carrying a gun. *J L*, 529 US at 268. Responding officers corroborated

9

Accordingly, through *Guertins* and up until *Navarette*, Michigan caselaw (applying both our Constitution and the federal Constitution) and the United States Supreme Court's caselaw were both consistent in disallowing searches or seizures based solely on anonymous information. But by weakening the requirement "that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person," *J L*, 529 US at 272, the *Navarette* Court moved its Fourth Amendment jurisprudence out of alignment with our cases. The United States Supreme Court based its conclusion that the tip was reliable on the fact that the caller had reported being run off the road by a specific vehicle and had identified the make, model, color, and license plate of the vehicle. *Navarette*, 572 US at 399. But anyone who observed the vehicle could have provided this information. The tip was only reliable in its tendency to identify the vehicle at issue, not in its assertion of illegality. Therefore, I agree with the *Navarette* dissenters that the *Navarette* majority opinion represents a departure from the "normal Fourth Amendment requirement that anonymous tips must be corroborated[.]" *Navarette*, 572 US at 405 (Scalia, J., dissenting). And, as a result, an argument can be made that adopting its reasoning would result in a major contraction of the protections against unreasonable searches and seizures in our state Constitution.[8]

---

only the identifying details of the defendant; they had no other reason to suspect him of illegal conduct, and they did not see a firearm. *Id*. Upon frisking the defendant, the officers found a gun. *Id*. The United States Supreme Court concluded that the officers lacked a reasonable basis for stopping the defendant. *Id*. at 271.

[8] Indeed, in his characteristically vivid prose, Justice Scalia described the majority opinion as "serv[ing] up a freedom-destroying cocktail . . . ." *Navarette*, 572 US at 413 (Scalia, J., dissenting).

At least one other court has declined to adopt *Navarette*'s reasoning when interpreting the protections available under its own state constitution. See *Commonwealth v Depiero*, 473 Mass 450, 455; 42 NE3d 1123 (2016) (citing Justice Scalia's dissent in declining to adopt *Navarette* under the state constitution and declining to rely on the mere fact that the 911 call at issue was recorded as indicia of reliability). See also *Washington v ZUE*, 183 Wash 2d 610, 625-630; 352 P3d 796 (2015) (McCloud, J., concurring) (advocating for the adoption of Justice Scalia's approach under state law).[9]

For these reasons, this Court should consider, in an appropriate future case, whether to interpret our state Constitution as providing more protection regarding anonymous tips than the Fourth Amendment as interpreted by *Navarette*, i.e., whether to retain the requirement that an anonymous tip be reliable *both* in its assertion of illegality *and* in its tendency to identify a determinate person for purposes of our state Constitution.

David F. Viviano
Bridget M. McCormack

---

[9] Even if this Court were to reject anonymous tips alone as a basis for justifying a stop, i.e., tips not corroborated by police investigation, this would not leave law enforcement without at least some recourse when an anonymous caller reports an alleged drunk driver. A 911 dispatcher can always ask a caller for his or her name and is free to advise an anonymous caller that responding officers may not be able to stop the vehicle if the caller is unwilling to provide his or her identity. And even if attempts to gather more information from the caller are not fruitful, responding officers can investigate further by following the vehicle to see if the driver commits a civil infraction or if there is independent evidence of intoxication sufficient to justify an investigatory stop under *Terry*.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                     No. 159981

VICTORIA CATHERINE PAGANO,

      Defendant-Appellant.

_____

ZAHRA, J. (*concurring*).

    I concur with the result reached by the majority. Applying the United States Supreme Court's decision in *Navarette v California*,[1] I conclude that the 911 caller's conclusory allegation that defendant drove while intoxicated, absent further record evidence leading to an inference of an actual traffic violation, was insufficient to provide the arresting officer with the requisite reasonable suspicion to justify the traffic stop. I write separately, however, to emphasize that my conclusion is driven largely by the limited, seemingly incomplete, factual record before us and that nothing in the majority opinion should be read to discourage citizen reports or police investigations of drunk or impaired driving.

    As is evident from the majority opinion's recounting of the facts, the record before us is quite bare. According to the arresting officer's testimony at the hearing to dismiss defendant's charges, the officer received a call from central dispatch "about a female driver

_____

[1] *Navarette v California*, 572 US 393; 134 S Ct 1683; 188 L Ed 2d 680 (2014).

that was possibly intoxicated" leaving a public-access area on M-25 near Port Crescent State Park. The officer testified that the public-access area was near the Buccaneer Den— a local tavern. He further testified that the caller informed dispatch that she had observed defendant outside her vehicle, yelling at her children, "appearing to be obnoxious," and "appear[ing] to be intoxicated," and that the caller believed defendant's intoxication "was causing her behavior . . . with the children." The caller provided the make, model, color, and license plate number of defendant's vehicle, and less than 30 minutes after the call, the officer located defendant's vehicle and initiated a traffic stop "based strictly on the information [he] received from [the] 9-1-1 dispatch." Beyond these facts, the officer's testimony tells us nothing more about why the caller or the officer suspected that defendant was driving while intoxicated.

Yet not only is the record sparse, it is seemingly incomplete. The 911 tape was not admitted into evidence, and review of the entire transcript from the motion hearing suggests that the 911 caller gave additional information about defendant's behavior and level of impairment. Specifically, in advocating for a dismissal of the charges, defense counsel repeatedly emphasized defendant's "speech patterns" as the basis for the 911 caller's observations, even stating that defendant has a "speech impediment." Further, defense counsel twice noted that the 911 caller described defendant as "wasted." Slurred or stammered speech is a classic sign of intoxication,[2] and the caller's use of the term

---

[2] See *Birchfield v North Dakota*, 579 US ___, ___; 136 S Ct 2160, 2167; 195 L Ed 2d 560 (2016) (noting that "outward signs of intoxication . . . [include] imbalance or slurred speech"); *People v Hammerlund*, 504 Mich 442, 453 n 5; 939 NW2d 129 (2019) ("[T]hat defendant was slurring her speech and unstable on her feet could possibly provide probable cause to believe that she was under the influence when the crash occurred[.]").

"wasted" suggests a high level of impairment beyond merely acting obnoxious. Had this additional evidence been made part of the record, along with any other evidence that might have been included in the 911 tape, it very well might have established sufficient indicia of intoxication under *Navarette* to support a reasonable and articulable suspicion of criminal activity once defendant began to operate her vehicle.[3] The Court of Appeals in this case was not prepared "to draw a fine distinction between slurred speech and stumbling versus yelling and acting obnoxious as indicia of intoxication."[4] Perhaps if the full record had been provided, we would not have to draw one here.

We must remember that "the ultimate touchstone of the Fourth Amendment is reasonableness."[5] At its core, the Fourth Amendment "balances the governmental interest that justifies the intrusion against an individual's right to be free of arbitrary police interference."[6] The more minimal the intrusion, the less information necessary to justify it

---

[3] See *Navarette*, 572 US at 401-402 & 402 n 2 (holding that the 911 caller's tip regarding the defendant's reckless driving supplied the police with reasonable suspicion of the ongoing criminal activity—drunk driving—to justify the traffic stop).

[4] *People v Pagano*, unpublished per curiam opinion of the Court of Appeals, issued May 28, 2019 (Docket No. 340859), p 5.

[5] *Heien v North Carolina*, 574 US 54, 60; 135 S Ct 530; 190 L Ed 2d 475 (2014) (quotation marks and citation omitted).

[6] *People v Faucett*, 442 Mich 153, 158; 499 NW2d 764 (1993), citing *Terry v Ohio*, 392 US 1, 20-21; 88 S Ct 1868; 20 L Ed 2d 889 (1968). See also *Brown v Texas*, 443 US 47, 50-51; 99 S Ct 2637; 61 L Ed 2d 357 (1979) ("The reasonableness of seizures that are less intrusive than a traditional arrest depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the

for Fourth Amendment purposes. This is particularly true in the context of automobiles, in which we have recognized that "[f]ewer foundation[al] facts are necessary to support a finding of reasonableness when moving vehicles are involved, than if a house or a home were involved."[7]

In weighing citizens' diminished expectation of privacy in their motor vehicles[8] against the minimally invasive nature of a traffic stop, it is questionable whether the officer's actions in this case were wholly unreasonable. As the Court of Appeals recognized, the officer faced a difficult choice: conduct a minimally invasive investigatory stop on "a vehicle that potentially was being piloted by an intoxicated driver with two children as passengers" solely on the basis of a citizen's anonymous tip, or "wait and see whether the driver would reveal her lack of sobriety by violating traffic laws or, worse, becoming involved in a car accident . . . ."[9] Indeed, five years before the Supreme Court's decision in *Navarette*, Chief Justice John Roberts discussed the sobering implications of today's ruling:

---

public interest, and the severity of the interference with individual liberty.") (quotation marks and citations omitted).

[7] *People v Whalen*, 390 Mich 672, 682; 213 NW2d 116 (1973).

[8] The "ready mobility" and "pervasive regulation" of motor vehicles serve as the two core rationales for "treating automobiles differently from houses as a constitutional matter." *Collins v Virginia*, 584 US ___, ___; 138 S Ct 1663, 1669-1670; 201 L Ed 2d 9 (2018) (quotation marks and citations omitted). See also *South Dakota v Opperman*, 428 US 364, 367; 96 S Ct 3092; 49 L Ed 2d 1000 (1976) ("[T]he expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.").

[9] *Pagano*, unpub op at 5.

The effect of the rule [barring police from acting on anonymous tips of drunk driving unless they can verify each tip] will be to grant drunk drivers "one free swerve" before they can legally be pulled over by police. It will be difficult for an officer to explain to the family of a motorist killed by that swerve that the police had a tip that the driver of the other car was drunk, but that they were powerless to pull him over, even for a quick check.[10]

We have also recognized that "the Fourth Amendment does not require a policeman to simply shrug his shoulders and allow a crime to occur or a criminal escape."[11]

Unlike the majority, I do see this as a close case. But given the lack of *record* evidence supporting an inference of an actual traffic violation and the 911 caller's conclusory allegation of drunk driving, I conclude that this case falls on the other side of *Navarette*. Even so, I encourage citizens to continue to report their suspicions of drunk or impaired driving, urge police officers to remain vigilant in protecting our state's highways, and implore prosecutors to use all available evidence to ensure that an accurate and complete record is developed.

Brian K. Zahra

WELCH, J., did not participate in the disposition of this case because the Court considered it before she assumed office.

---

[10] *Virginia v Harris*, 558 US 978; 130 S Ct 10, 12; 175 L Ed 2d 322 (2009) (Roberts, C.J., dissenting).

[11] *Whalen*, 390 Mich at 682.

5